**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REPRESENTATIVE TED LIEU<br>415 Cannon House Office Building<br>Washington, DC 20515 | )<br>)<br>)<br>) |
| REPRESENTATIVE WALTER JONES<br>2333 Rayburn House Office Building<br>Washington, DC 20515 | )<br>) **CIVIL ACTION NO. 16-cv-2201**<br>)<br>) |
| SENATOR JEFF MERKLEY<br>1351 SE 114th Ave<br>Portland, OR 97216 | ) **COMPLAINT FOR**<br>) **DECLARATORY AND**<br>) **INJUNCTIVE RELIEF**<br>) |
| STATE SENATOR (RET.) JOHN HOWE<br>2345 South Oak Drive<br>Red Wing, MN 55066 | )<br>)<br>)<br>) |
| ZEPHYR TEACHOUT<br>4236 Albany Post Road<br>Hyde Park, NY 12538 | )<br>)<br>)<br>) |
| MICHAEL WAGER<br>40 Ridgecreek Trail<br>Moreland Hills, OH 44022 | )<br>)<br>)<br>)<br>) |
| *Plaintiffs*,<br>v. | )<br>)<br>)<br>) |
| FEDERAL ELECTION COMMISSION<br>999 E Street, NW<br>Washington, DC 20463 | )<br>)<br>)<br>) |
| *Defendant*. | )<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**PRELIMINARY STATEMENT**

1.     A bare two months after the Supreme Court held in *Citizens United v. FEC*, 558

U.S. 310 (2010), that corporations and labor unions may use their own funds to make unlimited

*independent expenditures*, the D.C. Circuit in *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), voided the long-established statutory limits for *contributions* to any political committee that restricts its spending to independent expenditures. That decision—which birthed the so-called "super PAC" and radically transformed American politics as a result—rested entirely on the misapprehension of a single sentence in *Citizens United* to the effect that "independent" expenditures, by definition, cannot corrupt. If true, so *SpeechNow* reasoned, then *contributions* to political committees that make only independent expenditures also cannot corrupt or even appear to do so. But *SpeechNow*'s facile conclusion is flawed. It misconstrues *Citizens United*, ignores foundational distinctions between expenditures and contributions, and is belied by six years' experience with unlimited and potentially collusive contributions to super PACs.

2.      The Supreme Court has not yet had occasion to redress the erroneous conclusion in *SpeechNow*, and Plaintiffs therefore have filed an administrative complaint with the Federal Election Commission seeking to enforce the contribution limits that *SpeechNow* erroneously overturned. Unfortunately, the systemic crisis resulting from that decision has been compounded by the FEC's failure to act on the administrative complaint within the time prescribed by statute. For this reason, Plaintiffs have initiated this judicial challenge.

3.      The FEC's inability to diligently work through its enforcement docket has been thoroughly documented in the press and relevant commentary, *see, e.g.,* Eric Lichtblau, *F.E.C. Can't Curb 2016 Election Abuse, Commission Chief Says*, N.Y. Times, May 2, 2015 (quoting three sitting Commissioners' acknowledgments that agency's enforcement process is paralyzed),

and the Commission's own leadership has publicly acknowledged as much.[1] Whatever the cause or excuse for agency delay, there is every reason to conclude that, unless this Court compels the FEC to resolve the administrative complaint within 30 days as the statute contemplates, the agency's inertia and inaction will continue to compound the error of *SpeechNow*—not only to the detriment of Plaintiffs, but more generally to the detriment of the nation's campaign finance system and its capacity to stem corruption and the appearance of corruption.

## INTRODUCTION

4.      Plaintiffs Representative Ted Lieu, Representative Walter Jones, Senator Jeff Merkley, State Senator (ret.) John Howe, Zephyr Teachout, and Michael Wager (Plaintiffs) bring this action for declaratory and injunctive relief against the Federal Election Commission (FEC) pursuant to 52 U.S.C. § 30109(a)(8)(A), challenging as contrary to law the FEC's failure to act on an administrative complaint filed by Plaintiffs under the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30101 *et seq*., on July 7, 2016.

5.      Under FECA, contributions to political committees are subject to dollar limits. For political committees that are not the authorized committees of candidates or political parties, the applicable limit is $5,000 per contributor per year. 52 U.S.C. § 30116(a)(1)(C); 11 C.F.R.

---

[1] For example, Commissioner Walther of the FEC recently explained:

> At present there are, and for an undue time there have been, numerous matters before the Commissioners that have been held for more than a reasonable period of time. . . .  For various reasons, mostly unpersuasive, . . . the Commissioners have delayed voting on many of these pending matters for an excessive period of time. . . .  The bottom line is that we, the Commissioners, have simply not been doing our work in as timely a fashion as we should, and need to do a better job of managing our duties and responsibilities in this area.

FEC Commissioner Steven T. Walther, *Motion to Set Priorities and Scheduling on Pending Enforcement Matters Awaiting Reason-to-Believe Consideration* 2-3, Agenda Doc. No. 15-41-A, http://go.usa.gov/xkMHj (July 14, 2015).

§ 110.1(d). This contribution limit "appl[ies] to contributions made to political committees making independent expenditures." 11 C.F.R. § 110.1(n). A political committee may not knowingly accept any contribution in violation of that limit. 52 U.S.C. § 30116(f).

6. On July 7, 2016, Plaintiffs filed a sworn administrative complaint with the FEC. The complaint identified ten respondents, all registered with the FEC as independent expenditure-only committees (popularly known as super PACs), and all of which accepted contributions substantially exceeding the $5,000 per contributor per year limit:[2] House Majority PAC, Congressional Leadership Fund, Senate Majority PAC, Senate Leadership Fund, American Alliance PAC, Bold Agenda PAC, Defending Main Street SuperPAC Inc., ESAFund, Freedom Partners Action Fund, Inc., and New York Wins PAC.

7. Pursuant to 52 U.S.C. § 30109(a)(8)(A), Plaintiffs ask the Court to declare that the FEC's failure to act on their administrative complaint is contrary to law, and to order the FEC to conform with this declaration within 30 days.

## BACKGROUND

### FECA's limits on contributions to political committees

8. The primary purpose of FECA is "to limit the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley v. Valeo*, 424 U.S. 1, 26 (1976) (per curiam). As the Court explained, "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id.* at 26-27. In this vein, "a limitation upon the amount that any one person or

---

[2] By referring to the super PAC respondents as "independent expenditure-only committees," plaintiffs do not confirm or concede that their expenditures are in fact truly independent, but only that they have registered with the FEC as such.

group may contribute to a . . . political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20.

9.     In 1976, just two months after *Buckley*, Congress amended FECA to include, among other provisions, annual limits on contributions to political committees other than the authorized committees of candidates or political parties. *See* Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, § 112(2), 90 Stat. 475, 486-87 (May 11, 1976). That provision remains substantially the same today. *See* 52 U.S.C. § 30116(a)(1)(C) (2016).

10.    In 1976, in the FEC's very first proposed regulations to implement FECA, the FEC proposed a provision specifying that this limit "also appl[ies] to contributions to committees making independent expenditures." FEC, *Federal Election Campaign Act*, 41 Fed. Reg. 21,572, 21,585 (May 24, 1976) (codified at 11 C.F.R. § 110.1(d) (1976)). Over several revisions, the FEC has preserved this provision in substantially the same form as it reads today, *see* 110 C.F.R. § 110.1(n) (2016), noting over the years that no public commenters had ever objected. *See* FEC, *Coordinated and Independent Expenditures*, 68 Fed. Reg. 421, 449 (Jan. 3, 2003) ("The Commission received no comments on this section."); FEC, *Contribution and Expenditure Limitations and Prohibitions; Contributions by Persons and Multicandidate Political Committees*, 52 Fed. Reg. 760, 764 (Jan. 9, 1987) ("None of the public comments received addressed this provision.").

## The *SpeechNow* litigation

11.    In March 2010, the U.S. Court of Appeals for the D.C. Circuit found the limit in § 30116(a)(1)(C) to be unconstitutional as applied to (1) SpeechNow.org, an unincorporated nonprofit association that promised to make only independent expenditures, and (2) its contributors. *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc). In so doing, the D.C. Circuit extended *Citizens United v. FEC*, 558 U.S. 310 (2010), which concerned a

*spender-based ban* on *independent expenditures*, to the entirely different context of a *contributor-based dollar limit.*

12.     The Department of Justice chose not to seek Supreme Court review of the *SpeechNow* decision, partly on the theory that "the particularly limited nature of SpeechNow's contribution and expenditure practices means that the court of appeals' decision will affect only a small subset of federally regulated contributions." Letter from Att'y Gen. Eric H. Holder, Jr., to Sen. Harry Reid (June 16, 2010), http://1.usa.gov/298RWaP. The Supreme Court has never considered the question.

### Developments since *SpeechNow*

13.     In *SpeechNow*, the D.C. Circuit opined that "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." 599 F.3d at 694. This departed from both *Buckley* and *Citizens United*, and improperly subjected contribution limits to the higher level of scrutiny that the Supreme Court currently applies to independent expenditure limits. *See* Albert W. Alschuler, *Limiting Political Contributions After McCutcheon, Citizens United, and* SpeechNow, 67 Fla. L. Rev. 389, 474-76 (2015). As defined by the Supreme Court, "an independent expenditure is political speech presented to the electorate." *Citizens United*, 558 U.S. at 360. However, "[a] contribution is not 'speech presented to the electorate.' A contribution is money given to a coordinating body." Lawrence Lessig, *What an Originalist Would Understand "Corruption" to Mean*, 102 Cal. L. Rev. 1, 21 (2014). Moreover, as set forth below, the D.C. Circuit's pronouncement that contributions to independent expenditure groups "cannot corrupt or create the appearance of corruption" has proven empirically wrong.

14.     Since *SpeechNow*, and contrary to Attorney General Holder's prediction that "the court of appeals' decision will affect only a small subset of federally regulated contributions,"

the number of super PACs has exploded, as has the size of contributions to them and their influence in federal races. In the 2016 cycle, there are approximately 3,000 organized federal super PACs. *See* FEC, *Committees* (search result for super PACs active 2015-16), http://1.usa.gov/28SqlJD (last visited Nov. 2, 2016). By April 2016, over 40% of federal super PAC contributions had come from just 50 funders and their families. Matea Gold & Anu Narayanswamy, *The new Gilded Age: Close to half of all super-PAC money comes from 50 donors*, Wash. Post, Apr. 15, 2016, http://wpo.st/Uhv_1. By November 2016, federal super PACs had reported total receipts of over $1.566 billion and total independent expenditures of over $980 million. *See* Ctr. for Responsive Politics, *Super PACs*, https://www.opensecrets.org/pacs/superpacs.php (last updated Nov. 2, 2016)*.*

15.    While much of the national media coverage of super PACs focuses on presidential elections, super PACs are increasingly dominant in the funding of congressional elections. *See* Gold & Narayanswamy, *supra* (noting that "[w]ealthy patrons also are turning their attention to congressional races" and that already "more than two dozen super PACs each backing a single House or Senate candidate have emerged," but that "[t]he biggest surge of cash is likely to come this fall, when millionaires and billionaires aligned with both parties fully engage in the fights for control of the White House and Congress"). By late March 2016, outside groups (super PACs and political nonprofits such as 501(c)(4) organizations) from both the Democratic and Republican parties had *already* spent a combined $34.1 million on races for seats in the House and Senate—85% more than the $18.4 million that had been spent by the same time in the 2012 elections. Bill Allison, *With GOP in Disarray, Super-PACs Target Congress*, Bloomberg Politics (Mar. 22, 2016), http://bloom.bg/1pxhuo7.

## Corruption and the appearance of corruption through super PACs

16.   Recent public opinion surveys reveal widespread perceptions of corruption in both Congress and the federal government as a whole. In a February 2016 Rasmussen Reports survey, 61% of likely voters agreed that most members of Congress were "willing to sell their vote for either cash or a campaign contribution," with the same percentage believing it likely that their own representative had done the same. In a September 2015 Gallup survey, 75% of respondents agreed that corruption was widespread in government, up from 66% in 2009. In an April 2012 Pew Research Center survey, 54% of respondents described the United States government as "mostly corrupt." In a 2011 Center for Competitive Politics/Cooperative Congressional Election Study survey, 59.2% of respondents agreed that a contribution of $5,000 or more could exert a corrupting influence on a candidate for Congress.

17.   In particular, public opinion demonstrates an appearance of corruption specifically attributable to large super PAC contributions. In an October 2012 Democracy Corps/Public Campaign Action Fund survey, 59% of voters in 54 competitive congressional districts agreed that "[w]hen someone gives 1 million dollars to a super PAC, they want something big in return from the candidates they are trying to elect." In an April 2012 Brennan Center for Justice survey focusing specifically on super PACs, 69% of respondents (including 74% of Republicans and 73% of Democrats) agreed that "new rules that let corporations, unions and people give unlimited money to Super PACs will lead to corruption." Seventy-three percent of respondents (75% of Republicans, 78% of Democrats) agreed that "there would be less corruption if there were limits on how much could be given to Super PACs," and 68% of respondents (71% of Democrats, 71% of Republicans) agreed that "a company that spent $100,000 to help elect a member of Congress could successfully pressure him or her to change a vote on a proposed law." In a March 2012 ABC News/Washington Post survey, 69% of

respondents stated that super PACs should be illegal. A similar survey that asked the same question in North Carolina, the home state of plaintiff Walter Jones, yielded nearly identical results.

18.     Even assuming that a super PAC does not "coordinate" its campaign strategy with a supported candidate, a contributor to that super PAC is still free to discuss both the "quid" and the "quo" with the candidate. *See* Alschuler, *supra*, 67 Fla. L. Rev. at 475. Interviews with former Members of Congress, recent congressional candidates, campaign and legislative staff, and political operatives suggest how such quid pro quo agreements could occur. *See* Daniel B. Tokaji & Renata E.B. Strause, *The New Soft Money* (2014), http://moritzlaw.osu.edu/ thenewsoftmoney/wp-content/uploads/sites/57/2014/06/the-new-soft-money-WEB.pdf. As one campaign operative explained: "So the Member calls and says 'Hey, I know you're maxed out – and I can't take any more money from you – but there's this other group. I'm not allowed to coordinate with them, but can I have someone call you?'" *Id.* at 68. The same conversation could then proceed to discuss legislative matters, including an agreement to take some official action in exchange for the donor's contributions to the "other group," *i.e.*, the super PAC. Furthermore, many super PACs support only one candidate, and both contributors and the candidate know in advance that any contribution to such a super PAC would be spent in support of that candidate.

19.     Recent empirical research demonstrates that top donors to super PACs and other outside spending groups simultaneously contribute directly to the very candidates who benefit from the independent expenditures drawn from those donors' contributions. In other words, large donors to super PACs also maintain direct financial relationships with candidates—a coordinated contribution strategy that enables the *contributor* to bridge the distance between

candidate and super PAC, and circumvent federal contribution limits by amplifying direct contributions beyond the legal maximum. *See* Stephen R. Weissman, *The* SpeechNow *Case and the Real World of Campaign Finance* (Oct. 2016).

20.     The availability of quid pro quo transactions through super PAC contributions creates a potential for corruption, and an appearance of corruption that is confirmed by the public. For this reason, enforcing the contribution limits of 52 U.S.C. § 30116(a)(1)(C) against super PACs is justified by the interest in preventing corruption and the appearance of corruption.

21.     In July 2010, the FEC issued Advisory Opinion No. 2010-11 (*Commonsense Ten*) (July 22, 2010), http://1.usa.gov/298r8dg, to a political committee that later became Senate Majority PAC. The FEC opined that the political committee's "planned course of action, which involves soliciting and accepting unlimited contributions from individuals, political committees, corporations, and labor organizations for the purpose of making independent expenditures . . . complies with the Act." *Id.* at 2.

22.     The Court of Appeals for the D.C. Circuit has not yet revisited *SpeechNow* in any context beyond the specific facts in that as-applied challenge. However, the facts alleged in the administrative complaint involved at least two complainants, at least one respondent super PAC, and at least ten excess contributions made or located in states that are within the jurisdiction of circuits that have not yet ruled on the issues presented by *SpeechNow*, and in which FEC action under 52 U.S.C. § 30109(a)(6)(A) is not precluded by any circuit precedent.

23.     Moreover, to the extent that *SpeechNow* applies to Plaintiffs' claim that the FEC's failure to act on their administrative complaint was contrary to law, facts have emerged that call into question *SpeechNow*'s conclusion that "contributions to groups that make only independent

expenditures also cannot corrupt or create the appearance of corruption." 599 F.3d at 694.

Plaintiffs assert their claims in order to preserve these issues for appeal.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C.

§ 1331.

25.     Venue in this district is proper pursuant to 52 U.S.C. § 30109(a)(8)(A) and 28

U.S.C. § 1391(e).

## PARTIES

26.     Ted Lieu is a United States Representative from California's 33rd District and a

Democrat. In his 2014 election campaign, he was targeted by spending from two super PACs,

American Alliance and Bold Agenda PAC. American Alliance spent $506,407 in his race

(including an attack ad falsely linking him to a terrorist group), of which $500,000 came from a

single donor.

27.     As a Member of Congress, Representative Lieu is interested in upholding federal

campaign finance law. Furthermore, Representative Lieu is running for re-election in 2016, and

still faces unregulated super PAC contributions that can be used in an attempt to influence

federal elections in which he is a candidate. If the FEC does not faithfully enforce § 30116, he

will be open to attack, particularly during critical time periods just before the election, in

broadcast advertising campaigns mounted by groups created to evade the contribution limits

imposed by Congress. Furthermore, Representative Lieu expects to run for Congress again in

2018, and expects to face the strong risk that unregulated super PAC contributions will again be

used in an attempt to influence federal elections in which he is a candidate.

28.     Walter Jones is a United States Representative from North Carolina's 3rd District

and a Republican. In his 2014 election campaign, he was targeted by spending from a super

11

PAC called Ending Spending Action Fund (now known as ESAFund), which spent $381,354 opposing him and $353,252 supporting his then-opponent.

29.     As a Member of Congress, Representative Jones is interested in upholding federal campaign finance law. Furthermore, Representative Jones is running for re-election in 2016, and still faces unregulated super PAC contributions that can be used in an attempt to influence federal elections in which he is a candidate. If the FEC does not faithfully enforce § 30116, he will be open to attack, particularly during critical time periods just before the election, in broadcast advertising campaigns mounted by groups created to evade the contribution limits imposed by Congress. Furthermore, Representative Jones expects to run for Congress again in 2018, and expects to face the strong risk that unregulated super PAC contributions will again be used in an attempt to influence federal elections in which he is a candidate.

30.     Jeff Merkley is a United States Senator from Oregon and a Democrat. He participates in this matter in his individual capacity and in anticipation of being a candidate for re-election in 2020. In his 2014 election campaign, he was targeted by spending from a super PAC called Freedom Partners Action Fund, Inc., which spent $1,020,016 opposing him.

31.     As a Senator, Senator Merkley is interested in upholding federal campaign finance law. Furthermore, Senator Merkley expects to run for re-election in 2020, and still faces unregulated super PAC contributions that can be used in an attempt to influence federal elections in which he is a candidate. If the FEC does not faithfully enforce § 30116, he will be open to attack, particularly during critical time periods just before the election, in broadcast advertising campaigns mounted by groups created to evade the contribution limits imposed by Congress.

32.     John Howe is a former Minnesota State Senator, and earlier this year was a Republican candidate for United States Congress from Minnesota's 2nd District. Although Mr. Howe did not win the August 9, 2016 Republican primary, he expects to run for Congress again in 2018, and still faces unregulated super PAC contributions that can be used in an attempt to influence federal elections in which he is a candidate. For example, in this election cycle, House Majority PAC, a super PAC which supports Democrats and opposes Republicans in Congressional races, reserved $2,415,794 of television time in the Minneapolis media market months in advance, and has already spent over $759,000 opposing the Republican candidate for Congress from Minnesota's 2nd District. If the FEC does not faithfully enforce § 30116, in future races Mr. Howe will be open to attack, particularly during critical time periods just before the election, in broadcast advertising campaigns mounted by groups created to evade the contribution limits imposed by Congress.

33.     Zephyr Teachout is the Democratic candidate for United States Congress from New York's 19th District. This district has been identified by outside observers as a highly competitive race.

34.     In the 2016 Republican primary race for New York's 19th District, a super PAC called New York Wins PAC, which supported the eventual primary winner, spent over $915,000. In the general election for this seat, a super PAC called Congressional Leadership Fund has spent over $3,596,000 opposing Ms. Teachout. Ms. Teachout still faces unregulated super PAC contributions that can be used in an attempt to influence federal elections in which she is a candidate. If the FEC does not faithfully enforce § 30116, she will be open to attack, particularly during critical time periods just before the election, in broadcast advertising campaigns mounted by groups created to evade the contribution limits imposed by Congress.

Furthermore, Ms. Teachout expects to run for Congress again in 2018, and expects to face the strong risk that unregulated super PAC contributions will again be used in an attempt to influence federal elections in which she is a candidate.

35.     Michael Wager is the Democratic candidate for United States Congress from Ohio's 14th District. In 2014, he ran for this seat against the incumbent Representative, and he was targeted by spending from a super PAC called Defending Main Street SuperPAC Inc. In the 2014 election cycle, Defending Main Street SuperPAC Inc. spent $82,000 opposing his candidacy, and $39,550 supporting the candidacy of his then-opponent, Representative David Joyce. In 2016, Mr. Wager is again running against Representative Joyce. In the 2016 election cycle, Defending Main Street SuperPAC Inc. has spent over $243,000 supporting the candidacy of Representative Joyce.

36.     Mr. Wager still faces unregulated super PAC contributions that can be used in an attempt to influence federal elections in which he is a candidate. If the FEC does not faithfully enforce § 30116, he will be open to attack, particularly during critical time periods just before the election, in broadcast advertising campaigns mounted by groups created to evade the contribution limits imposed by Congress. Furthermore, Mr. Wager expects to run for Congress again in 2018, and expects to face the strong risk that unregulated super PAC contributions will again be used in an attempt to influence federal elections in which she is a candidate.

37.     Defendant Federal Election Commission is an independent federal agency charged with the administration and civil enforcement of FECA. 52 U.S.C. § 30106.

## FACTS

38.     On July 7, 2016, Plaintiffs filed a sworn administrative complaint with the FEC. The administrative complaint specifically recited the following facts, each documented with citations to data available from the FEC itself:

14

**House Majority PAC**

39.    On June 30, 2015, House Majority PAC accepted a $500,000 contribution from S. Donald Sussman of North Haven, ME, the Founder and Chairman of Paloma Partners.

40.    On September 3, 2015, House Majority PAC accepted a $500,000 contribution from S. Donald Sussman of North Haven, ME, the Founder and Chairman of Paloma Partners.

41.    On December 28, 2015, House Majority PAC accepted a $1,000,000 contribution from Fred Eychaner of Chicago, IL, the President of Newsweb Corporation.

42.    On December 29, 2015, House Majority PAC accepted a $500,000 contribution from S. Donald Sussman of North Haven, ME, the Founder and Chairman of Paloma Partners.

43.    On January 7, 2016, House Majority PAC accepted a $1,000,000 contribution from James Simons of New York, NY, the President of Euclidean Capital.

44.    On February 18, 2016, House Majority PAC accepted a $500,000 contribution from Bernard Schwartz of New York, NY, the Chairman and CEO of BLS Investments.

**Congressional Leadership Fund**

45.    On October 3, 2014, Congressional Leadership Fund accepted a $5,000,000 contribution from Sheldon Adelson of Las Vegas, NV, the Chairman of Las Vegas Sands.

46.    On July 1, 2014, Congressional Leadership Fund accepted a $1,000,000 contribution from Chevron (Corporation), of Concord, CA.

47.    On March 31, 2016, Congressional Leadership Fund accepted a $1,000,000 contribution from Chevron (Corporation), of Concord, CA.

**Senate Majority PAC**

48.    On June 8, 2012, Senate Majority PAC (then known as Majority PAC) accepted a $300,000 contribution from Vitreo-Retinal Consultants of the Palm Beaches, of West Palm Beach, FL.

49.     On October 16, 2012, Senate Majority PAC (then known as Majority PAC) accepted a $300,000 contribution from Vitreo-Retinal Consultants of the Palm Beaches, of West Palm Beach, FL.

50.     On August 28, 2015, Senate Majority PAC accepted a $1,000,000 contribution from George Marcus of Palo Alto, CA, the Chairman of Marcus & Millichap Company.

51.     On December 28, 2015, Senate Majority PAC accepted a $1,000,000 contribution from Fred Eychaner of Chicago, IL, the President of Newsweb Corporation.

### Senate Leadership Fund

52.     On April 30, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Robert McNair of Houston, TX, the Chairman of Houston Texans.

53.     On May 7, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Bernard Marcus of Atlanta, GA, the Chairman of the Marcus Foundation.

54.     On May 20, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Paul Singer of New York, NY, the Founder and CEO of Elliott Management Group.

55.     On August 27, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Warren Stephens of Little Rock, AR, the Chairman, President, and CEO of Stephens Inc.

56.     On September 28, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Chevron (Corporation), of Concord, CA.

57.     On October 9, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Petrodome Energy, of Houston, TX.

58.     On December 8, 2015, Senate Leadership Fund accepted a $1,000,000 contribution from Access Industries, of New York, NY.

**American Alliance**

59.    On October 22, 2014, American Alliance accepted a $500,000 contribution from Sheldon Adelson of Las Vegas, NV, the Chairman of Las Vegas Sands.

**Bold Agenda PAC**

60.    On October 14, 2014, Bold Agenda PAC accepted a contribution of $110,000 from Americans for Shared Prosperity, an organization registered under Section 501(c)(4) of the Internal Revenue Code and reportedly headed by winery owner John Jordan. Two days later, Bold Agenda PAC accepted a contribution of $250,000 from John Jordan of Healdsburg, CA, the CEO of Jordan Winery.

61.    On October 15, 2014, Bold Agenda PAC accepted a contribution of $145,000 from Americans for Shared Prosperity.

**Defending Main Street SuperPAC Inc.**

62.    On February 22, 2016, Defending Main Street SuperPAC Inc. accepted a contribution of $200,000 from Robert Ziff of New York, NY, an investment banker at Ziff Brothers Investments.

63.    On February 26, 2016, Defending Main Street SuperPAC Inc. accepted a contribution of $250,000 from LIUNA Building America of Washington, DC, itself a super PAC funded mainly by contributions exceeding $5,000 per year.

64.    On May 17, 2016, Defending Main Street SuperPAC Inc. accepted a contribution of $200,000 from Sean Parker of Washington, DC, a self-employed entrepreneur.

**ESAFund**

65.    On April 16, 2015, ESAFund accepted a contribution of $500,000 from Paul Singer of New York, NY, the Founder and CEO of Elliott Management Group.

66.     On August 4, 2015, ESAFund accepted a contribution of $850,000 from Marlene Ricketts of Omaha, NE, a retiree.

67.     On December 11, 2015, ESAFund accepted a contribution of $500,000 from Paul Singer of New York, NY, the Founder and CEO of Elliott Management Group.

68.     On December 30, 2015, ESAFund accepted a contribution of $500,000 from Kenneth Griffin of Chicago, IL, the Founder and CEO of Citadel, LLC.

### Freedom Partners Action Fund, Inc.

69.     On September 8, 2014, Freedom Partners Action Fund, Inc. accepted a contribution of $2,500,000 from Robert Mercer of East Setauket, NY, the co-CEO of Renaissance Technologies.

70.     On October 17, 2014, Freedom Partners Action Fund, Inc. accepted a contribution of $3,000,000 from Charles G. Koch 1997 Trust, attributed to the Chairman of the Board and CEO of Koch Industries, Inc., of Wichita, KS.

71.     On May 13, 2016, Freedom Partners Action Fund, Inc. accepted a contribution of $2,000,000 from Diane Hendricks of Afton, WI, the Chairperson of Hendricks Holding Co., Inc.

72.     On May 13, 2016, Freedom Partners Action Fund, Inc. accepted a contribution of $2,000,000 from Mountaire Corporation of Little Rock, AR.

73.     On May 24, 2016, Freedom Partners Action Fund, Inc. accepted a contribution of $1,000,000 from Richard B. Gilliam of Keswick, VA, the President, Chairman, and CEO of Cumberland Development.

74.     On May 24, 2016, Freedom Partners Action Fund, Inc. accepted a contribution of $3,000,000 from Charles Koch of Wichita, KS, the Chairman of the Board and CEO of Koch Industries, Inc.

**New York Wins PAC**

75.    On January 29, 2016, New York Wins PAC accepted a contribution of $500,000 from Robert Mercer of Setauket, NY, a financial consultant at Renaissance Technologies.

76.    On May 13, 2016, New York Wins PAC accepted a contribution of $500,000 from Paul Singer of New York, NY, the Founder and CEO of Elliott Management Group.

**Allegations of violation**

77.    The administrative complaint alleged that the respondents have knowingly accepted multiple contributions that exceed $5,000 per person per year, in violation of 52 U.S.C. § 30116(a)(1)(C) and (f) and 11 C.F.R. §§ 110.1(d) and (n), and, on information and belief, would continue to do so.

78.    In light of the FEC's *Commonsense Ten* advisory opinion and 52 U.S.C. § 30108(c)(2), the complaint specifically disclaimed any intent of asking the FEC to seek civil penalties or other sanctions for past conduct, but rather asked the FEC to pursue only declaratory and/or injunctive relief against future acceptance of excessive contributions.

**ADMINISTRATIVE PROCEEDINGS**

79.    Plaintiffs filed the administrative complaint with the FEC on July 7, 2016.

80.    On or about July 14, 2016, the FEC sent each Plaintiff a letter acknowledging receipt of the administrative complaint.

81.    The FEC has failed to act on Plaintiffs' administrative complaint to date.

82.    As a result of the FEC's failure to act, Plaintiffs have been forced to raise money and campaign in a system that is subject to the risk and appearance of quid pro quo corruption (and other forms of corruption) through large contributions to super PACs that exceed the limits that Congress determined were necessary to protect against corruption.

## VIOLATIONS

### Count I

83.     Plaintiffs reallege and incorporate by reference paragraphs 1 to 82 as if fully set forth herein.

84.     The FEC's failure to act on Plaintiffs' administrative complaint within 120 days of its filing was contrary to law under 52 U.S.C. § 30109(a)(8)(A).

### Count II

85.     Plaintiffs reallege and incorporate by reference paragraphs 1 to 84 as if fully set forth herein.

86.     By failing to act on Plaintiffs' administrative complaint within 120 days of its filing, the FEC unlawfully withheld and/or unreasonably delayed agency action under 5 U.S.C. § 706(1).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs, by their undersigned counsel, respectfully request that the Court grant the following relief:

a)  Declare that the FEC's failure to act on Plaintiffs' administrative complaint was contrary to law under 52 U.S.C. § 30109(a)(8)(A);

b)  Declare that the FEC has unlawfully withheld and/or unreasonably delayed agency action on Plaintiffs' administrative complaint under 5 U.S.C. § 706(1);

c)  Order the FEC to conform with this declaration within 30 days;

d)  Award legal fees and costs of suit incurred by Plaintiffs; and

e)  Grant such other and further relief as this Court deems just and proper.

Dated:  November 4, 2016

Respectfully submitted,

/s/ Stephen A. Weisbrod
Stephen A. Weisbrod (D.C. Bar No. 439152)
**WEISBROD MATTEIS & COPLEY PLLC**
1200 New Hampshire Ave., NW, Suite 600
Washington, DC 20036
(202) 499-7900
sweisbrod@wmclaw.com

Brad Deutsch (D.C. Bar No. 469636)
**GARVEY SCHUBERT BARER**
Flour Mill Building
1000 Potomac Street NW, Suite 200
Washington, DC 20007-3501
(202) 965-7880
BDeutsch@gsblaw.com

Malcolm Seymour
Andrew Goodman
**GARVEY SCHUBERT BARER**
100 Wall Street, 20th Floor
New York, NY 10005
(212) 431-8700
mseymour@gsblaw.com
agoodman@gsblaw.com

Laurence H. Tribe (*pro hac vice* pending)
*Of Counsel*
Hauser Hall 420
Harvard University*
Cambridge, MA 02138
(617) 495-1767

Ambassador (ret.) Norman Eisen (D.C. Bar  No. 435051)
*Of Counsel*
2022 Columbia Rd. NW, #214
Washington, DC 20009
(202) 462-2903

Ronald A. Fein (*pro hac vice* pending)
Scott Greytak
John C. Bonifaz
**FREE SPEECH FOR PEOPLE**
1340 Centre St. #209
Newton, MA 02459
(617) 244-0234
rfein@freespeechforpeople.org

Anne Weismann (D.C. Bar No. 298190)
**CAMPAIGN FOR ACCOUNTABILITY**
1201 Connecticut Ave., NW, Suite 300
Washington, DC 20036
(202) 780-5750
aweismann@campaignforaccountability.org

Albert W. Alschuler
*Of Counsel*
220 Tuttle Road
Cumberland, ME 04021
(207) 829-3963

Richard Painter
*Of Counsel*
Mondale Hall, Office 318
University of Minnesota Law School*
229 19th Avenue South
Minneapolis, MN 55455
(612) 626-9707

*Attorneys for Plaintiffs*

*University affiliation noted for identification purposes only.